[L. A. No. 827.   Department One. — August 7, 1901.]

## J. J. MABB et al., Respondents, v. LYMAN STEWART et al., Appellants.

ACTION FOR DAMAGES — FAILURE TO SUPPLY WATER FOR IRRIGATION — INJURY TO ORANGE TREES — SUPPORT OF VERDICT. — In an action for damages for failure to supply the plaintiff with water for irrigation of his land, to which he claimed a right, where the evidence tended to show that the orange trees of the plaintiff were damaged, by reason of such failure, in the amount found by the jury, their verdict will not be disturbed upon the question of damages.

ID. — OWNERSHIP OF WATER STOCK BY MORTGAGEE — DIRECTION TO WATER COMPANY TO DISCONTINUE SUPPLY — DUTY OF COMPANY. — Where, by the records of the water company, a mortgagee of the plaintiff appeared as the owner of the water stock formerly held by the plaintiff, it was the duty of the water company to obey his directions to discontinue the supply of the water thereupon.

ID. — ERRONEOUS INSTRUCTION AS TO AGENCY NOT PROVED — NOTICE OF OWNERSHIP OF STOCK TO WATER COMPANY. — Where there was no proof to show the relation of principal and agent between the mortgagee as the holder and apparent owner of the stock, and the water company or its secretary, it was erroneous for the court to give an instruction based upon the supposition of such agency, so as to bind the mortgagee as principal, by notice given to the water company, as his agent, that the plaintiff claimed ownership of the shares of stock.

ID. — NON-PAYMENT OF ASSESSMENTS BY PLAINTIFF — DISCLAIMER OF OWNERSHIP — DIRECTION GIVEN IN GOOD FAITH — REFUSAL OF PROPER INSTRUCTION. — Where there was evidence to support a requested instruction, to the effect that if plaintiffs, knowing that assessments were due and unpaid upon the water stock, refused to pay them, and disclaimed ownership of the stock prior to the diversion of the water, and the defendant mortgagee acted in good faith on such disclaimer in directing the water company to discontinue the water, " then the plaintiffs cannot recover in the action," such instruction was proper, and it was error to refuse it.

ID. — ARGUMENTATIVE INSTRUCTIONS. — It was error to give instructions strongly argumentative in favor of the plaintiffs, which were not justified by the evidence.

ID. — PUNITIVE DAMAGES — REFUSAL OF PROPER INSTRUCTION — ERROR NOT CURED — RIGHT OF DEFENDANT. — Where the case made did not entitle the plaintiff to punitive damages, it was error to refuse an instruction, properly requested, to that effect, and the error of such refusal was not cured by an instruction that the jury should award compensatory damages only.  The defendant had the right to a positive instruction that they must not award punitive damages.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. John L. Campbell, Judge.

The facts are stated in the opinion of the court.

Otis & Gregg, and E. H. Jolliffe, for Appellants.

J. L. Murphey, for Respondents.

HENSHAW, J. — Plaintiffs, husband and wife, allege that they were the owners of ten acres of land in the Ontario Colony, and the owners of ten shares of water stock of the San Antonio Water Company; that by virtue of their ownership of this water stock they were entitled, for use upon their land, to a certain amount of water, supplied by the San Antonio Water Company. This water was divided amongst the shareholders of the San Antonio Water Company, in proportion to the number of their shares, and to the amount of water which, from time to time, the company had available for the purpose of distribution. They allege that they had complied with all the rules and regulations of the company, and were not in default with the company in any particular. In August, when the orchard of fruit-bearing trees upon their land was greatly in need of water, and upon a day in August when plaintiffs were of right entitled to use water, the defendants, without right, for the purpose of injuring plaintiffs, and of destroying their orchard, shut off the water and prevented it from flowing upon their lands, and diverted it and used it upon other lands below. Plaintiffs, though making diligent inquiry, were unable to procure any other supply of water until some time afterward, but before they were able so to do, by reason of the unlawful acts of defendants their orchard, trees, and premises were injured to the amount of five thousand dollars. The second count charges upon the same facts, but avers, additionally, that plaintiffs were also obliged to borrow water for domestic use; that defendants well knew that this would be the result of their acts, and at the time intended and expected that plaintiffs would suffer inconvenience, loss, and humiliation thereby, which in fact they did suffer; and that the acts of the defendants so committed without right were done willfully and maliciously, and with intent to injure. Judgment was prayed for in the sum of $5,215. The case was tried before a jury, a non-

suit was granted in favor of the San Antonio Water Company, defendant, and verdict by the jury, in favor of plaintiffs, against the defendant Lyman Stewart, was rendered in the sum of two thousand five hundred dollars. From the judgment which followed, and from the order of the court denying defendant Stewart's motion for a new trial, he appeals.

His first contention here is upon the insufficiency of the evidence to sustain the judgment. Upon this proposition it is argued, that plaintiffs were not damaged at all, or if damaged at all, damaged to a trifling amount, and that whatever damage might have resulted to them was not occasioned by any wrongful act of defendant. The San Antonio Water Company, as has been said, issued its stock to owners of land, who thereby became entitled to the use of a certain amount of water, depending upon their number of shares and the amount of the water-supply. With the plaintiffs' land went ten shares of this water stock,—one share per acre. Plaintiffs had mortgaged their land and this water stock to defendant Stewart. Upon the books of the corporation Stewart appeared as the owner of the stock. Differences arose between Stewart and his mortgagors over payments of interest upon the mortgage and assessments of water stock, which differences involved the question of the ownership of the water stock itself. These differences resulted in Stewart giving instructions to the water company to cut off the supply of water from plaintiffs' land. Plaintiffs had been accustomed to receive, about the seventh day of each month, for a space of twelve hours, a head of water amounting to about twenty inches measured under a four-inch pressure. Upon the seventh day of August, the water was turned upon their land, and flowed thereon for the period of four hours and forty-five minutes, when the supply was shut off. Plaintiffs were unable to procure any water until the eighteenth day of August, when they purchased the right of one of the lower users for six hours. They could not procure any more water until the eighteenth day of September, when their turn to use water came around again, and they were permitted to enjoy the usual flow.

Upon the proposition that plaintiffs suffered no damage, it is contended that if they had received the full supply to which they plead they were entitled, it is shown that this supply would have been wholly inadequate to protect the orchard

during the exceptionally hot and dry month of August. Moreover, that upon the seventh day of August defendant deprived them of only seven hours and fifteen minutes of their flow, and that upon the eighteenth day of August they obtained a six-hour flow, at a cost of fifteen dollars. The fact that the orchard suffered notwithstanding this later flow, shows that the supply was inadequate, even if it had not been interfered with. It is further contended, that the evidence showed that there was water available to plaintiffs for irrigating purposes; that they did not display diligence in seeking to acquire water to avert the threatened damage; and that their recovery, therefore, must be limited to the amount they would have been called upon to expend in procuring the needed supply. But, as against this, there is still sufficient evidence in the case to show that the plaintiffs' trees and premises were injured to the amount found by the jury; that if the usual flow of August had been permitted, there was reasonable prospect and probability of a good crop; that plaintiffs did display diligence in seeking to purchase other water, but were unable to do so; and finally, that the four-hours' flow permitted upon the seventh day of August, and the six-hours' flow obtained upon the eighteenth day of August, were of little or no value to the land, because the first few hours' run thus turned in went practically to waste in saturating the ditches and runways, and it was only the flow of the later hours which would have been valuable for irrigating and preserving the trees. This evidence, therefore, is sufficient to support the verdict of the jury upon the question of damage.

The more important question yet remaining is that of defendant's responsibility for the damage, and the correctness of the instructions of the court bearing thereon. The matters in controversy between the parties, which led to the order given by Stewart to the water company to shut off the water from plaintiffs' lands, are in evidence without substantial conflict. The plaintiffs, as has been said, were in arrears upon their mortgage interest, and were owing Stewart for assessments upon their hypothecated water stock, which assessments he had paid. Of course he was within his right in making these payments to protect his security. In July, 1898, the amount of the assessments upon the stock so paid by Stewart was seventy dollars. In the February preceding, Mr. Murphey,

attorney for the plaintiffs, received from J. S. Torrance, on behalf of defendant Stewart, a letter, in answer to one from him of February 11th, inclosing a check for $82.73. In his letter to Torrance, Murphey stated that this was the sum " which Mrs. Mabb claims is the amount due upon the note." Replying, Torrance returned the check, explaining by dates and figures that there was due for interest upon the mortgage a sum considerably in excess of one hundred dollars, and stating further: " I am advised by Mr. Stewart that Mrs. Mabb has not paid the mortgage taxes nor the water taxes, either this year or last. He writes me that the mortgage, for some reason, this year was assessed to H. H. Merriman, and that he personally paid the taxes. I neglected to mention that these securities were held by Mr. McCulloch as collateral to secure a loan, but the duty has fallen upon the estate of Mr. McCulloch to collect this matter. . . . When you advise me that you have the proper sum of money to pay, although it is putting me to unnecessary trouble, I will show you the note and make the proper indorsement." The contents of this letter were communicated by Mr. Murphey to the Mabbs, and, shortly following it, upon February 18th, the plaintiff Mrs. Mabb, who was the owner of the property, wrote to Mr. Murphey to the effect that Mr. Torrance made contradictory statements regarding assessments and taxes, both of which she made bold to state were false. She sets forth the payments of interest which she says that she had made, and proceeds: " I know nothing whatever about the mortgage tax which Mr. Torrance states I had assessed. . . . The water-tax assessments he has nothing whatever to do with. At the time of the exchange, Mr. Merriman told Mr. Mabb that as Mr. Lyman Stewart still owned the water stock, he, Mr. Stewart, would have to pay all assessments, and he has never demanded a cent from me, neither do I expect he will, as it is customary here in the colony for party owning stock to pay the same, and can cite to others who can testify to the same." Here it may be said that Mrs. Mabb's statement to the effect that Mr. Merriman told Mr. Mabb that Mr. Stewart would have to pay all assessments upon the water stock is denied, and it is further shown by Merriman's testimony, and by that of others, that Merriman himself always paid them. Merriman, it should be added, was the grantor of the Mabbs to the land which they owned, and, while he owned it, had mortgaged it to Stewart,

upon precisely the same mortgage, affecting the water stock as well as the land, as that which the Mabbs gave when they acquired title.   On February 24th, Murphey, after receipt of Mrs. Mabb's letter, writes again to Torrance, setting forth the contents of his client's letter, and saying: "The water-tax assessments she has nothing to do with, and she stated that at the time of the exchange Mr. Merriman told Mr. Mabb, as Mr. Stewart still owned the water stock, he, Stewart, would pay all assessments, and that he has never demanded a cent from her, and that it is customary in the colony for parties owning stock to pay the same, and that she can cite to others who can testify to the same." This letter was forwarded by Torrance to defendant Stewart. In reply to it, he wrote to Torrance as follows: "As to the water assessments, it is the invariable rule that the party owning the water stock pays the assessments on it, whether pledged or unpledged.   If Mrs. Mabb refuses to pay the assessments, she should be refused the use of water, and the secretary of the San Antonio Water Company should be notified that Mrs. Mabb, through her attorney, had disclaimed ownership of the stock, and refuses to pay the assessments, and hence should not be allowed to use the water.   This stock being held by the estate for which you are acting, I would suggest that you act in the matter in such a way as to fully protect its interests."   Stewart's letter was written on February 28, 1898.   Thus in February of that year the Mabbs were informed that there were assessments upon the water stock which they had not paid, and which Stewart had paid.   They disclaimed ownership of the stock.   This disclaimer was made known to their attorney, and though in argument he seems to think that it was a preposterous idea that the Mabbs should thus disclaim ownership of valuable property, which was merely pledged at that time, he manifestly sees nothing in their declaration to excite his surprise, for he formally notifies Torrance that his clients refuse to pay the water assessments because they are not the owners of the stock.   On July 6th, Stewart wrote Mr. Shepherd, the secretary of the water company, to divert the water represented by the ten shares of water stock, under which plaintiffs' land had been supplied, to other lands, until the assessments upon the stock should be paid.   Repeatedly, in July and in August, after the receipt of this letter, the secretary notified the Mabbs that the water

would be turned off if the water assessments were not paid. He further testifies, that, as secretary of the company, he would have received the assessment-money, but that the Mabbs never offered to pay him. Under these circumstances it was that the water was turned off from plaintiffs' land. Later, Mr. Murphey, attorney for plaintiffs, told Mr. Stewart that his clients would pay the water assessments, and upon this statement Stewart immediately gave directions to the secretary of the water company to permit the usual flow, and this they received the following month. Upon the trial of the case Mrs. Mabb gives evidence radically at variance with the contents of her letter. While her letter contains the flat refusal to pay water assessments, and an absolute disclaimer of ownership in the stock, in her testimony she says that she did not understand that the water assessments were to be paid by her till the mortgage was due, and that she did not know it was claimed that she should pay the water-tax assessments. It is certainly not easy to harmonize these statements with the declarations in her letter. Against all this evidence, the claim is made that Stewart never made any formal demand upon the Mabbs for the water-stock assessments; that, as appears by Mrs. Mabb's testimony, she had never given up her right to the ten shares of stock; that her letter to her attorney related solely to the payment of interest upon the mortgaged note; that she did not know what right Torrance had to ask her about water assessments; that he did not ask her to pay them, nor did she understand by the letter that he claimed that she should pay them; that she expected to pay everything, taxes and all assessments, when the mortgage became due; and much ridicule is here cast upon the testimony of Stewart, when he says, " The real controversy between us was their disclaiming ownership," and that he wanted to settle the question before it was too late. But, considering the disclaimer of ownership communicated by plaintiffs' attorney, we see small occasion for ridiculing or belittling this testimony; and wherein the conduct of defendant shows "malice, recklessness, oppression, and utter disregard of the plaintiffs' rights in the premises," as plaintiffs' counsel repeatedly assert, we are utterly at a loss to perceive.

But, passing this point, we proceed to a consideration of the instructions. The court instructed the jury as follows: " The jury are instructed that, in law, a person can act by others,

and the act of the agent in carrying out the orders of the principal is the act of the principal, and notice or knowledge conveyed to an agent in the matter which is being or about to be undertaken by the agent for the principal is notice and knowledge of the principal; and if you find from the evidence that the defendant Lyman Stewart requested the defendant San Antonio Water Company, or any of its officers, to shut off the water to which the plaintiff J. W. Mabb was entitled, if you find that she was so entitled, and you find from the evidence that prior to the time of the shutting off of the water, and some time either in the month of July or August, 1898, the plaintiff notified the San Antonio Water Company and the defendant B. C. Shepherd that she claimed the right to the use of the water in question because of her ownership of the said ten shares of stock, and notified the agents of the defendant Stewart that she had not given up or abandoned her rights to the said stock to said Stewart, or any other person, and that she then protested against said water being shut off when her turn to use the same should come on the seventh day of August, 1898, or thereabouts, then, as a matter of law, the notice and knowledge of the agent or agents of the said defendant in the said matter was also notice and knowledge to him, and if you find from the evidence that notwithstanding such notice and protest, that said agents of said defendant shut off the water, then in such shutting off of said water said defendant acted at his peril, and assumed all the consequences which would naturally or reasonably flow from his act in shutting off the water, and if you so find, then the defendant is responsible to the plaintiff for all damages which she sustained by reason of having been deprived of said water, and which was the proximate result of said act."

As to this instruction, it is sufficient to say, that, by the records of the corporation, Stewart appeared as the owner of ten shares of stock. It was the corporation's duty to obey the directions of Stewart, therefore, as to the use of the water represented by that stock. But to distort out of this an agency of the water company, or of the secretary of the water company, with Stewart as principal, so as to bind Stewart by such notification as the Mabbs might give the company, is wholly unpermissible, and could have served but to lead the jury into the belief that there was some evidence establishing an agency for the indicated purpose, whereas in fact there was none at

all. If the vice of this instruction needs be made more apparent, it will be seen in considering an instruction proposed by the defendant and refused by the court, and the reasons assigned by the plaintiffs' attorney in justification of that refusal. The instruction is addressed wholly to the evidence within the case, and is unimpeachable in its declaration of the law. It is as follows: "If you find that, prior to the diversion of the water from plaintiffs' land, plaintiffs knew that there were assessments due and unpaid on the water stock in controversy, and refused to pay said assessments, and, through their attorney, or otherwise, disclaimed ownership of said stock, and that the defendant Stewart, in good faith, acted on such disclaimer of ownership in directing the San Antonio Water Company to divert the water, then the plaintiffs cannot recover in this action."

Defendant's attorney declares that he experienced difficulty in understanding why this instruction was refused. In justification, it is said, merely: "This instruction could not be given in this case, because it was undisputed that Mrs. Mabb and her husband, before the water was turned off, notified the agent of Stewart, who is presumed to have notified him, Stewart, there being no evidence to the contrary, that she did claim to own the stock and the right to use it. Therefore there could be no good faith on the part of Stewart, and there was no disclaimer of the ownership of the stock in any manner." The inaccuracies of this statement are too apparent to require even an enunciation of them. Of the instructions generally it may be said that they are strongly argumentative in favor of plaintiffs. For example, in the eleventh instruction it is said: "The jury are further instructed, that if you find from the evidence that the plaintiff was entitled to the use of the water complained of, at the time in question, and further find that the defendant seeks to excuse himself in the premises on the ground that the plaintiff abandoned or gave up her right to the use of the water in question, then the burden is upon the defendant to show such abandonment."

It might be said by plaintiff's attorney, and indeed is said, that Stewart is seeking to excuse himself, but it is scarcely a phrase proper for an instruction by a court to a jury, under a defense of disclaimer of ownership, made out by the written declarations of plaintiff, accompanied by the written declara-

tion of plaintiff's attorney.  Still further in the same instruction it is said: "If you find from the evidence that the defendant, or any of those acting for him, had been notified by said plaintiff that she had not abandoned her right or claim to use said water, just prior to the cutting off of the said water by said defendant, such notice would put the defendant upon inquiry," etc.  Here, the defendant is charged with the knowledge of anybody "acting for him," without regard to the capacity in which they were acting or the limitation of their agency. The water company was "acting for him,"—that is to say, was obeying his direction, as it was their duty to do in the matter of turning off the water,—but it does not follow therefrom that they were instituted his agents for the purpose of receiving a notification, or that Stewart became any more chargeable because of the claim which they may have served upon the water company, than he would have been chargeable with knowledge of their claim if they had asserted it to his cook. We need not discuss the argumentative nature of these instructions further.  It is sufficient to refer to the cases of *Morris* v. *Lachman*, 68 Cal. 109; *People* v. *McNamara*, 94 Cal. 513; *People* v. *Vereneseneckockockhoff*, 129 Cal. 497.

The court further refused the following instruction: "The jury are further instructed, that this is not a case for punitive or exemplary damages, and that the plaintiffs can in no event recover more than such damages as were actually suffered by them in the taking of the water from their land."

Why this instruction was not given we are not enlightened in respondents' brief, further than that it is said that it should not have been given, "because there was evidence of both malice and oppression on the part of Stewart toward the Mabbs."  This was not a case for punitive damages, as the trial court concluded.  Yet the complaint sought damages upon that theory, and the instructions proposed by plaintiffs and given by the court contain many intimations looking toward punitive damages; and finally, the refusal to give the instruction is here upheld by plaintiffs' attorney, upon the ground that it was a case for punitive damages.  The refusal to give an instruction when requested, and when it is pertinent to the case, is undoubted error, and it is not cured by an instruction that the jury should award compensatory damages only.  The defendant has the right to a positive instruction that they must

not award punitive damages. (*Sloane* v. *Southern Cal. Ry. Co.*, 111 Cal. 687; 2 Thompson on Negligence, sec. 1264; 11 Encyclopædia of Pleading and Practice, 213.) In *Chicago Ry. Co.* v. *Scurr*, 59 Miss. 456,[1] it is said: "We are prepared to go a step further, and say, that in any and all actions for damages, where the proof fails to show anything that will warrant an imputation of willfulness, recklessness, or rudeness, it is the duty of the court to inform the jury, when requested so to do, that they cannot inflict punitive damages. Not to do so in a case free from doubt, would be an abdication of judicial authority, and a permission to the jury to violate the settled principles of law."

For the foregoing reasons the judgment and order are reversed and the cause remanded for a new trial.

McFarland, J., and Temple, J., concurred.

Hearing in Bank denied.